**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

In re:

PRIME CAPITAL VENTURES, LLC,

                Alleged Debtor.

Invol. Chapter 7

Case No. 23-11302 (REL)

## ALLEGED DEBTOR'S REPLY IN FURTHER SUPPORT OF MOTION FOR A BOND

HOGAN LOVELLS US LLP
Pieter Van Tol (Bar Roll # 508405)
Chris Bryant (admitted *pro hac vice*)
390 Madison Avenue
New York, NY  10017
Tel: (212) 918-3000
Fax: (212) 918-3100
pieter.vantol@hoganlovells.com
chris.bryant@hoganlovells.com

*Attorneys for Alleged Debtor*

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................3

    I.    There Is No Fraud Here and the Petitioners' Allegations Sound in Breach of Contract ......................................................................................................3

    II.    Prime Capital Did Not Make Any Misrepresentations to the Court.......................5

        A.    Funds Relating to ICA Deposits ................................................. 5

        B.    Identity of Accountant and Number of Employees ................................. 11

    III.    526 Murfreesboro Is Facing Financial Difficulties.................................................11

    IV.    Counsel for Prime Capital Advises the Petitioners' Counsel of Mr. Cosgrove's Defamatory Communications ...........................................................11

ARGUMENT .........................................................................................................12

    I.    The "Totality of Circumstances" Demonstrates That Prime Capital Is Entitled to an Award of Attorneys' Fees, Costs and Damages Under 11 U.S.C. § 303(i).................................................................................................12

        A.    Prime Capital Did Not Act Improperly..................................................... 12

        B.    The Other Factors Weigh Heavily in Favor of an Award Under Section 303(i)........................................................................................ 13

    II.    The Petitioners Cannot Rely on Setoff to Avoid a Bond......................................15

    III.    Prime Capital Has Met Its Burden On Bad-Faith Damages .................................16

CONCLUSION.......................................................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Antar*,
   2012 WL 6200366 (Bankr. S.D. Fla. Dec. 12, 2012) ...............................................16

*In re CNG Foods LLC*,
   2020 WL 4219679 (Bankr. E.D.N.Y. July 13, 2020) ............................................14

*In re Kidwell*,
   158 B.R. 203 (Bankr. E.D. Cal. 1993) ....................................................................1

*National Medical Imaging, LLC v. U.S. Bank, N.A.*,
   263 F. Supp. 3d 542 (E.D. Pa. 2017) ...................................................................17

*In re Rosenberg*,
   471 B.R. 307 (Bankr. S.D. Fla. 2012) ..................................................................17

*In re Taub*,
   438 B.R. 761 (Bankr. E.D.N.Y. 2010) ..................................................................12

**Statutes**

11 U.S.C. § 303(i) ............................................................................................. *passim*

11 U.S.C. § 303(e) ............................................................................................ *passim*

**Other Authorities**

2 COLLIER ON BANKRUPTCY ¶ 303.11 (Alan N. Resnick & Henry J. Sommer
   eds. 16th ed.) ......................................................................................................12

H. Rep. No. 95–595, 95th Cong., 1st Sess. (1977) .......................................................1

Alleged Debtor Prime Capital Ventures, LLC ("Prime Capital"), by its counsel, respectfully submits this reply, along with the Reply Declaration of Pieter Van Tol dated March 4, 2024 (the "Van Tol Reply Declaration"), in further support of its motion (the "Motion") for an order requiring Petitioning Creditors Compass-Charlotte 103, LLC ("Compass"), 526 Murfreesboro, LLC ("526 Murfreesboro"), and Newlight Technologies, Inc. (collectively, the "Petitioners") to post a bond, pursuant to 11 U.S.C. § 303(e), in the amount of $37 million.

## PRELIMINARY STATEMENT

The purpose of Section 303(e) is clear. As one court has noted, "Congress did not mince words about what section 303(e) was intended to accomplish." *In re Kidwell*, 158 B.R. 203, 217 (Bankr. E.D. Cal. 1993). When Section 303(e) was enacted, Congress stated that:

> The bonding requirement will discourage frivolous petitions as well as the more dangerous spiteful petitions, based on a desire to embarrass the debtor (who may be a competitor of a petitioning creditor) or to put the debtor out of business without good cause (an involuntary petition may put a debtor out of business even if it is without foundation and is later dismissed).

*Id.* at 217-18 (quoting H. Rep. No. 95–595, 95th Cong., 1st Sess. at 323 (1977), U.S. Code Cong. & Admin. News 1978, p. 6279).

This case presents the exact situation that Section 303(e) is designed to address. The Petitioners' own actions and admissions demonstrate that the involuntary petition filed on December 19, 2023 (the "Petition") was both frivolous and spiteful, with the twin goals of embarrassing Prime Capital and putting it out of business (both of which the Petitioners accomplished). Indeed, even the circumstances of the Petition's dismissal prove the Petitioners' bad faith. On Monday, January 8, 2024, immediately after Prime Capital filed the Motion and accompanying motion to dismiss (*see* Dkt. Nos. 69 and 72), the Petitioners hastily withdrew the Petition. (Dkt. No. 74). As discussed below, they did so after Prime Capital provided them with

evidence the previous Friday that Daniel Cosgrove of 526 Murfreesboro had contacted numerous companies in the industry pre-Petition and engaged in a smear campaign designed to interfere with Prime Capital's business. *See infra*, 14-15.

In their opposition to the Motion (the "Opposition"), the Petitioners ignore these facts and devote only two pages of the 20-page Opposition to the first, third and fourth factors of the "totality of circumstances" test, which focus on the merits of the petition, the reasonableness of the petitioning creditors' actions, and the motivation and objective of the petition, respectively. (*See* Opp'n at 11 (admitting applicability of standard); 18-20 (discussing the Petitioners' actions).) The Petitioners seek to minimize those three factors because they have no good response. Instead, the evidence submitted with the Motion, along with circumstances surrounding the Petition's withdrawal, conclusively demonstrate that the Petitioners acted in bad faith.

In an effort to divert attention from their bad faith, the Petitioners focus on Prime Capital's alleged conduct—the second factor in the "totality of circumstances" standard—and they rely heavily on purported evidence that they learned about post-Petition (which, by its very nature, could not have affected the decision to file the Petition). As discussed below, the Petitioners' repeated incantations of "fraud" or a "Ponzi scheme" in Opposition are based on speculation and unproven allegations, and they stem from a fundamental misinterpretation of the relevant contracts between the Petitioners and Prime Capital. The Petitioners assert that Prime Capital was required to place their ICA deposits in trust. That is not the case, and nothing in the contracts mandates a segregation of funds. At most, there is a dispute here between the Petitioners and Prime Capital about whether there was a breach of contract and, if so, what the damages are. Also, the actual evidence (as opposed to Petitioners' unsupported allegations) show that Prime Capital was the victim of Berone's fraud. Prime Capital believed, in good faith, that it had access to hundreds of

2

millions of dollars in credit through Berone, which would have been more than enough to cover the ICA deposits and fund loans.  Thus, the second factor in the "totality of circumstances" test does not allow the Petitioners to escape the consequence of their bad-faith filing.

Finally, the Petitioners do not address the evidence previously submitted by Prime Capital that 526 Murfreesboro appears to be in financial trouble and might not have the resources to satisfy a judgment against it.  *See infra*, 11.  The request for a bond is even more urgent given those circumstances and because a central purpose of a bond is to prevent impecunious creditors from evading the consequences of their bad faith.

Accordingly, Prime Capital respectfully requests that the Court grant the Motion and order the Petitioners to post a bond in the amount of $37 million.

## **BACKGROUND**

### I.    **There Is No Fraud Here and the Petitioners' Allegations Sound in Breach of Contract**

The Petitioners continue to claim that Prime Capital engaged in fraud or operated  a Ponzi scheme, but, on closer scrutiny, their chief complaint is that Prime Capital did not segregate their ICA deposits and instead used them for other purposes.  (*See* Opp'n at 4-6.)  The Petitioners do not identify any fraudulent representation by Prime Capital that led them to the conclusion that their deposits would be held in trust.  In any event, the Petitioners could not rely on any such representations because the agreements between the Petitioners and Prime Capital (the "Credit Agreements") do not anywhere provide for the segregation of ICA deposits.  (*See* Mot. at 4.)  The Petitioners concede as much because they cite to two transactions, between Prime Capital and SP Harbor QOZB LP and between Prime Capital and ER Tennessee LLC, where there was an agreement to segregate funds.  (*See* Opp'n at 5.)  This highlights the fact that the Credit Agreements at issue here (and similar agreements between Prime Capital and other borrowers) did

3

not provide for the segregation of funds.[1]    More fundamentally, however, the Petitioners'

discussion about the provisions in various contracts illustrates that their claims are not actually for

fraud; to the contrary, the Petitioners are accusing Prime Capital of breaching the Credit

Agreements, to which Prime Capital has multiple, valid defenses.

As "evidence" of the alleged fraud, the Petitioners cite their own filings (which are

allegations only) and multiple submissions by the Receiver.  (*See* Opp'n at 3-6.)  The Receiver,

however, has accepted—without any question—Compass' legal theory that Prime Capital was

required to segregate the ICA deposits.  Therefore, the Receiver has concluded that any other use

of those funds must constitute misuse.  In addition to being contrary to the contractual language,

the Receiver's position reflects his view that he acts as an advocate, which is not the task of a

receiver.  The Receiver has also focused on Prime Capital, even though the evidence (as discussed

below) clearly points to Berone as the fraudulent actor.  Finally, the Receiver is assuming that

every purchase by Mr. Roglieri had no corporate purpose, such as investment or compensation for

Mr. Roglieri.  The record already shows that the Virginia Beach, Virginia property, which

Compass and the Receiver have held up as a purported misuse of funds, is a Prime Capital

investment.  That property, which has appreciated in value since its purchase, demonstrates the

issue with the Receiver's "Prime Capital is always in the wrong" approach.  The Court, therefore,

should not rely on Compass' unproven allegations or the Receiver's tendentious findings.

---

[1]      The Petitioners once again cite to a third transaction, involving 1800 Park Avenue ("1800 Park"),
but the agreement at issue there was not with Prime Capital.  It was between 1800 Park and Prime
Commercial Lending LLC.  As such, it is irrelevant to the claims against Prime Capital.

## II.    Prime Capital Did Not Make Any Misrepresentations to the Court

The Petitioners try to poison the well by alleging that Prime Capital, through Mr. Roglieri, made several false representations to this Court.  (*See* Opp'n at 6-11.)  Once again, the evidence does not support the Petitioners' claim.

### A.    Funds Relating to ICA Deposits

Most of the alleged misrepresentations center on the same issue, which is whether Prime Capital (as of December 2023) had the ability to return the ICA deposits in the event that the borrower properly terminated the agreement and declared a default event (which 526 Murfreesboro and Compass did not).  (*See id.* at 6-9.)  The Court will recall that, under the Credit Agreements, Prime Capital agreed that there would be a credit on its books and records with regard to the ICA deposits.  (*See* Mot. at 4.)

Prime Capital accomplished this by obtaining access to credit lines through Berone, a process which began around August 2022.  (Van Tol Reply Decl., **Exhibit A** hereto, Feb. 13, 2024 letter to P. Levine, at 6.)  At that time, Prime Capital entered into a relationship with Reign Financial International, Inc. ("Reign"), with the understanding that Reign would facilitate Prime Capital's investment with Berone.  On September 28, 2022, Prime Capital entered into a Joint Venture Agreement with Reign (the "Reign JVA").  That agreement specifically barred Reign from using the funds for anything other than investment.  (*Id.*)

On October 3, 2022, Reign and Prime Capital entered into the Trade Agreement, under which Prime Capital agreed to contribute $20 million, which would be invested at a Berone account.  (*See id.*; Ex. 3 thereto.)  The Trade Agreement provides that, based on its investment, Prime Capital would have access to a $600 million credit facility over a ten-month period.  (*See id.*)  As with the Reign JVA and other transaction documents, the Trade Agreement makes it clear

that the funds paid by Prime Capital cannot be used for purposes other than investing with Berone. (*See id.* at 7; Ex. 3 thereto.)

On October 7, 2022, Prime Capital entered into subscription documents in which it committed to investing $20 million with Berone to get access to Berone's credit lines and had the option to contribute additional funds for access to even higher lines. (*See id.* at 8; Ex. 4 thereto.) The bank records produced in the action pending before the District Court show that Prime Capital made the capital contribution of $20 million in late October 2022. The above documentation for the investment assured Prime Capital that it would have access to the Berone credit lines and Prime Capital received other assurances that the investment had been made. (*See id.* at 8.)

From November 2022 through late January 2023, however, Reign did not confirm the investment of Prime Capital's $20 million contribution and its access to the $600 million facility, despite Prime Capital's frequent demands. (*See id.*) When Prime Capital also complained to Berone in December 2022 and January, Berone repeatedly assured Prime Capital (with written documentation) that its $20 million was being held safe in an RBC account ending in 0011, and it placed the blame solely on Reign for any issues. By late January 2023, Prime Capital lost patience with the situation and terminated the agreements with Reign. (*See id.* at 8-9.)

In early February 2023, and to make up for Reign's failure to invest the $20 million, Berone agreed to give Prime Capital access to Berone's $300 million credit facility. Berone assured Prime Capital that this would cut Reign out of the process and would give Prime Capital access to the funds it needed in connection with Prime Capital's credit agreements with borrowers. Thus, the Berone credit line, along with other funds (such as the $7 million in another RBC ending in 0017), gave Prime Capital more than enough access to capital to cover the borrowers' ICA deposits (in the event the closing conditions were not met and they demanded a return). (*See id.* at 9-10.)

6

The Petitioners criticize Prime Capital for informing the Court in December 2023 that it had access to at least $52 million in a Berone RBC account for return of ICA deposits, but those statements were based on Berone's repeated assurances regarding the $300 million credit facility and a December 26, 2023 account statement (the "December 26 Statement"), which showed $52,364,000 that Berone said it was holding for the benefit of Prime Capital. Prime Capital reasonably relied on the December 26 Statement because it was very similar to statements that Prime Capital had received from Berone in late 2022 and throughout 2023 (as discussed below). The December 26 Statement, therefore, was consistent with Prime Capital's understanding of the minimum capital (in one RBC account alone) to which Prime Capital had access and was being held for Prime Capital's benefit. (*See id.* at 5.) It was only recently that Prime Capital learned that the December 26 Statement (and the other statements from Berone) were false.

As noted above, the various documents executed by Prime Capital with Berone showed that Berone was forbidden from transferring Prime Capital's $20 million contribution or using it for any purpose other than investment. Prime Capital also insisted that Berone provide periodic statements showing that the $20 million was still in the RBC account ending 0011. Prime Capital attached several of those statements (for the period from December 2022 through March 2023) to the sur-reply that it filed with the District Court on January 21, 2024. (*See* **Exhibit B** hereto.)

Those statements, however, turned out to be forgeries, which Prime Capital learned in late January 2024 in connection with the District Court action. Prime Capital has also learned, through the documents produced in the same case, that Berone also transferred most of the $20 million from the account ending 0011 without Prime Capital's knowledge or permission. The evidence of Berone's fraud is clear and it is summarized below.

7

On October 27, 2022 (immediately after Prime Capital made its $20 million payment), Berone transferred $3.4 million to a Berone account at Signature Bank and another $6 million to Martin Karo, Esq., who is associated with Berone.



(*See* Ex. A at 11; Ex. 5 thereto.)  On October 26, 2022, Berone bought a Ferrari and a Rolls Royce, and sent $400,000 to their TD Bank account.  (*See id.* at 11; Ex. 6 thereto.)

On November 8, 2022, Berone transferred another $5.9 million to its Signature Bank account.



(*See id.* at 11; Ex. 7 thereto.)

On November 9, 2022, Berone also transferred $11.8 million from its bank account to Mr. Karo.



(*See id.* at 11; Ex. 8 thereto.)

Thus, by the end of November 2022, there was only about $5.6 million left in the account

ending 0011.  However, in December 2022, Berone sent the following statement to Prime Capital

purportedly showing that the $20 million remained in the account:



**BERONE CAPITAL FUND LP**
for benefit of :

Prime Capital Ventures, LLC
66 South Pearl Street
10th Floor
Albany NY 12207
UNITED STATES
Attn:  Kris Roglieri

Partnership Account

**Your Financial Advisor**
Jeremiah Beguesse
3595 Canton RD
Suite 312-223
Marietta GA  30066
Telephone:   (678) 691-1984
E-mail:       jeremiah@beronecapital.com

**ACCOUNT STATEMENT**
November 1, 2022 - November 30, 2022

Account number:
0011
Page 1 of 5

**ACCOUNT VALUE SUMMARY**

| | THIS PERIOD | THIS YEAR |
|---|---|---|
| Beginning account value | $ 20,000,000.00 | $ 20,000,000.00 |
| Deposits | 20,000,000.00 | 20,000,000.00 |
| Withdrawals | 0.00 | 0.00 |
| Taxable income | 0.00 | 0.00 |
| Change in asset value | 0.00 | 0.00 |
| Ending account value | $ 20,000,000.00 | $ 20,000,000.00 |
| | | |
| Estimated annualized income | | $ 19,492.00 |

*Please see "About Your Statement" on page 2 for further information.*

**YOUR MESSAGE BOARD**

*RBC Clearing & Custody is a division of RBC Capital Markets, LLC (RBC CM), Member NYSE/FINRA/SIPC. RBC CM provides brokerage, back-office, and related services to investment advisors. RBC CM is the custodian of your brokerage account, and this statement is provided solely for that account.*

*If you have any questions, please reach out to your financial advisor.*

(*Id.* at 12; Ex. 9 thereto.)[2]

The above bank statement was false. Prime Capital learned only recently when RBC produced documents in the District Court action that the true statement was as follows and showed approximately $5.6 million in the account:





**ACCOUNT STATEMENT**
NOVEMBER 1, 2022 - NOVEMBER 30, 2022

Account number:
▮0011
Page 1 of 11

BERONE CAPITAL FUND LP
3595 CANTON RD / STE 312−223
MARIETTA GA 30066

YD0GA
BC1

**ACCOUNT VALUE SUMMARY**

| | THIS PERIOD | THIS YEAR |
|---|---|---|
| Beginning account value | $11,011,554.01 | $0.00 |
| Deposits | 441,303.00 | 21,441,303.00 |
| Withdrawals | −5,900,020.00 | −15,914,799.45 |
| Taxable income | 11,001.56 | 12,942.85 |
| Change in asset value | 7,489.80 | 31,881.97 |
| **Ending account value** | **$5,571,328.37** | **$5,571,328.37** |

Estimated annualized income | | $10,164.00

*Please see "About Your Statement" on page 2 for further information.*

**Partnership Account**

**Your Financial Advisor**
Jeremiah Begurasse
3595 Canton RD
Suite 312-223
Marietta GA 30066
Telephone:    (678) 619-1984
E-mail:    jeremiah@beronecapital.com

**YOUR MESSAGE BOARD**

*RBC Clearing & Custody is a division of RBC Capital Markets, LLC (RBC CM),
Member NYSE/FINRA/SIPC. RBC CM provides brokerage, back-office, and related
services to investment advisors. RBC CM is the custodian of your brokerage account,
and this statement is provided solely for that account.*

(*Id.* at 13; Ex. 7 thereto, RBCWM_PrimeCap_000072.)

The same pattern of presenting false bank statements continued into 2023, and it was not until January 2024 that Prime Capital received the actual statements. (*Compare* Ex. B (Dkt. Nos. 43-6, 43-7 and 43-8) *with* Ex. B (Dkt. Nos. 43-9, 43-10 and 43-11).)

The evidence, therefore, demonstrates that (a) Prime Capital had a good-faith basis for believing that it had access to more than sufficient funds to meet any liabilities arising under the agreements with borrowers; and (b) Berone defrauded Prime Capital, which Prime Capital did not discover until January 2024. The Opposition largely ignores this evidence, except in a footnote, where the Petitioners credit Berone's sworn statements regarding the money held for Prime

---

[2]    This bank statement was attached to an e-mail from Berone to Mr. Roglieri dated December 20, 2022. (*See id.*)

Capital's benefit. (Opp'n at 9, n.6.) The Petitioners, however, do not (and cannot) explain why they are accepting Berone's statements even though, in their court filings, they have repeatedly accused the Berone representatives of lying. Also, Berone's credibility is completely undercut by the above documents showing that they falsified the bank records sent to Prime Capital.

### B.    Identity of Accountant and Number of Employees

The Petitioners argue that Mr. Roglieri falsely stated that Christopher Sardone provided accounting services for Prime Capital. (Opp'n at 10.) As Prime Capital has advised previously, Mr. Sardone handled the accounting for other entities owned by Mr. Roglieri. Mr. Sardone was unaware of Prime Capital at the time Mr. Roglieri was asked to identify his accountant because Prime Capital had not yet filed its tax returns. Since Mr. Sardone has now filed the 2021 tax return, he is familiar with Prime Capital and its records. (*Id.*)

Equally unavailing is the Petitioners' claim that Mr. Roglieri misled the Court regarding the number of employees at Prime Capital. Prime Capital uses the services of the employees of other entities that Mr. Roglieri owns and, in providing those services, they act as independent contractors for Prime Capital while remaining the employees of those other entities.

### III.    526 Murfreesboro Is Facing Financial Difficulties

As Prime Capital has previously advised the Court, it appears that 526 Murfreesboro is on the cusp of bankruptcy or, at a minimum, having financial issues. (*See* Dkt. No. 122.) In mid-December 2023, Mr. Cosgrove informed Ms. Humphrey that "we face bankruptcy." (Dkt. No. 122-2.) This fact makes it even more critical that the Court order the Petitioners to post a bond.

### IV.    Counsel for Prime Capital Advises the Petitioners' Counsel of Mr. Cosgrove's Defamatory Communications

On Friday, January 5, 2024, counsel for Prime Capital sent an email to the Petitioners' counsel informing them that Mr. Cosgrove had sent defamatory statements to other companies in

the industry with the intent of interfering with Prime Capital's business.  (*See* **Exhibit C** hereto.)

On the following Monday, January 8, 2024, the Petitioners moved to dismiss the Petition.

## ARGUMENT

**I.** **The "Totality of Circumstances" Demonstrates That Prime Capital Is Entitled to an Award of Attorneys' Fees, Costs and Damages Under 11 U.S.C. § 303(i)**

The parties agree that a four-factor "totality of circumstances" standard applies to an award

under Section 303(i).  (*See* Opp'n at 11.)  Those four factors are the following: "(1) the merits of

the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3)

the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and

objectives behind the filing of the petition."  *In re Taub*, 438 B.R. 761, 775 (Bankr. E.D.N.Y.

2010) (quoting 2 COLLIER ON BANKRUPTCY ¶ 303.11 (Alan N. Resnick & Henry J. Sommer

eds. 16th ed.)).  The Petitioners focus almost exclusively on the second factor.

### A.    Prime Capital Did Not Act Improperly

The Petitioners summarize the alleged improper conduct by Prime Capital on pages 11

through 13 of the Opposition.  However, the only relevant conduct is pre-Petition because Section

303(i) looks at whether the petitioning creditors were justified in seeking involuntary bankruptcy.

The Petitioners list the alleged pre-Petition misconduct in subparagraphs (a) through (e)

(*see* Opp'n at 11-12), but, as discussed above, the Petitioners are essentially complaining about a

breach of contract.  *See supra*, 3-4.  Prime Capital denies that it breached any contract with the

Petitioners, but the point is that any such conduct does not justify the filing of an involuntary

bankruptcy.  To the contrary, the fact that the Petitioners and Prime Capital were engaged in a

contractual dispute, including a dispute over the amount of damages, is evidence of a bad-faith

filing.  The Petitioners knew that they were disqualified from filing the Petition because of their

disputes with Prime Capital (which were being litigated), but they filed anyway for the improper purpose of exacting leverage on Prime Capital, harassing it, and disrupting its operations.

With regard to the <u>post</u>-Petition conduct, which is not relevant to the Court's analysis, Prime Capital has demonstrated above that it did nothing wrong. Instead, the evidence uncovered in the post-Petition time period has shown that Prime Capital was the victim of Berone's fraud. *See supra*, 5-11. Therefore, to the extent that the Court takes Prime Capital's post-Petition events into consideration, they favor an award under Section 303(i).[3]

**B.    The Other Factors Weigh Heavily in Favor of an Award Under Section 303(i)**

The Petitioners barely discuss Factors 1 and 4, which are the merits of the Petition (Factor 1) and the motive and objectives behind filing the Petition (Factor 4). In a footnote, the Petitioners assert that the Petition was meritorious because "Prime is indisputably insolvent and has been running a Ponzi/fraud scheme." (Opp'n at 13 n.12.) Thus, the Petitioners ignore Prime Capital's showing in the Motion and the accompanying motion to dismiss that they did not meet the qualifications to act as petitioning creditors. (*See* Mot. at 16; Dkt. No. 72.) Thus, the Petitioners concede the point. The fact that the Petitioners dismissed the Petition as soon as it was challenged is additional proof that the Petition lacked merit.[4]

With regard to Factor 4, the Petitioners assert that their motive and objectives in filing the Petition were "to get their ICA deposits returned." (Opp'n at 13, n.12.) That terse explanation

---

[3]    Even in the Opposition, the Petitioners have continued their pattern of harassment. For example, the Petitioners refer to unrelated criminal charges against Mr. Roglieri and Ms. Humphrey. (*See* Opp'n at 12, n.10.) Those charges are not probative of anything, and they have no place in the Opposition. The Petitioners also cite FBI search warrants (*id.*), but it should be noted that neither Mr. Roglieri nor Ms. Humphrey have been charged with any crime in connection with those warrants.

[4]    The Petitioners argue the dismissal here bars an award under Section 303(i) because it was done with Prime Capital's consent. (*See* Opp'n at 14 n.13.) The Court should reject this disingenuous argument out of hand. As the Court is aware, Prime Capital raised this issue and consented to the dismissal only because of the reservation of rights. There is no reason for the Court to follow the out-of-Circuit cases cited

cannot be squared with the fact that two of the Petitioners were already seeking such relief (in addition to damages) through litigation at the time of the Petition. If their true interest were the return of the ICA deposits, the two Petitioners would have continued with those court actions. Instead, they filed the Petition and then dropped the previously-filed litigation to conceal the fact that they had a bona fide dispute with Prime Capital.

As to the Petitioning Creditors' true motivation for filing the Petition, Prime Capital presented the Court with an abundance of evidence in the Motion showing that the Petitioners were bent on destroying Prime Capital and used the Petition for leverage and harassment. (*See* Mot. at 6-13.) The Petitioners' cursory discussion of this evidence does nothing to undercut its force.

For example, the Petitioners try to defend the actions of Mr. Taft of Compass by referring to the December 13 and 14, 2023 texts as "snippets" that are "taken out of context." (Opp'n at 18.) The texts, however, are clear on their face. Mr. Taft stated that several parties were "working together" to make things "really bad" for Prime Capital. (Dkt. No. 70-16.) Mr. Taft specifically threatened "forced bankruptcy, criminal charges and media coverage" (*id.*), and he referred to the upcoming events as "thermonuclear war." (Dkt. No. 70-17.) It is hard to imagine a clearer admission that the Petition was part of a litigation strategy designed to hurt Prime Capital. The Petitioners also try to defend Mr. Taft's statements by citing texts on December 15, 2023 in which he refers to getting their deposits back. (*See* Opp'n at 18-19.) Those statements, however, cannot be reconciled with the lawsuit that Compass filed on the very same day in the Northern District of

---

by the Petitioners. Instead, it should follow *In re CNG Foods LLC*, 2020 WL 4219679 (Bankr. E.D.N.Y. July 13, 2020), where the court gave effect to such a reservation of rights and held that, under the circumstances, there was no consent to the dismissal. *See id.* at *9-10.

New York seeking tens of millions of dollars in damages, which is well in excess of the ICA deposit. (*See* Dkt. No. 70-15.)

The Petitioners' attempt to defend 526 Murfreesboro fares no better. In the Motion, Prime Capital provided example after example of Daniel Cosgrove of 526 Murfreesboro spreading falsehoods in the pre-Petition period with the intent of injuring Prime Capital's business. (*See* Mot. at 6-11.) The Petitioners insist, however, that "526 Murfreesboro provided truthful information to other parties — that [Prime Capital] was a fraudulent scheme which failed to fund loans." (Opp'n at 20.) This statement operates from the same faulty premise discussed above, *i.e.*, that Prime Capital's actions were fraudulent, when in fact the Petitioners are accusing Prime Capital of breaching their contracts. An allegation of breach of contract in no way justifies the defamatory statements made by Mr. Cosgrove. Those statements were intended to exact revenge on Prime Capital and hurt its business, and that was the same purpose of the Petition.

\* \* \* \* \*

In sum, the four factors in the "totality of circumstances" standard all weigh heavily in favor of an award under Section 303(i). The Petition was patently meritless and, by the Petitioning Creditors' own admission, they brought the Petition for the purposes of harassing Prime Capital and putting it out of business. The alleged "misconduct" by Prime Capital, which is a purported breach of contract, does not stand in the way of an award here. Given the likelihood of award under Section 303(i), the Court should order the Petitioners to post a bond.

## II.    <u>The Petitioners Cannot Rely on Setoff to Avoid a Bond</u>

The Petitioners assert that the Court should deny a bond because Prime Capital is allegedly holding $22 million of their cash and that constitutes "indemnification" for the harm that Prime Capital suffered. (*See* Opp'n at 14-15.) There are several issues with the Petitioners' argument.

*First*, given that Berone defrauded Prime Capital, it is not clear that Prime Capital holds sufficient funds to act as an indemnity for the harm that the Petitioners caused. In any event, the Receiver has taken the position that all funds held by Prime Capital are frozen and must be held for the benefit of potential creditors. *Second*, the Petitioners cite no case for their setoff argument and, indeed, the case law is to the contrary. For example, in *In re Antar*, 2012 WL 6200366 (Bankr. S.D. Fla. Dec. 12, 2012), the court noted that a petitioning creditor could offset its claim against a bond where (a) the claim was liquidated; and (b) there was no allegation of a bad-faith filing. *See id.* at *2-3. Here, the Petitioners do not have liquidated claim and Prime Capital has alleged that the Petitioners acted in bad faith. As a result, setoff does not apply here.

The Petitioners also argue that a bond in this case would have no deterrent effect because the Petition has been dismissed and there is no current conduct by the Petitioners to deter. (Opp'n at 15.) Section 303(e) and 303(i), however, are clearly designed to deter <u>other</u> petitioning creditors. Under the Petitioners' logic, there would never be any award under Section 303(i) or a bond under Section 303(e) because those provisions only apply when the court has dismissed an involuntary petition. The Court should reject such a misinterpretation of Section 303(e) and 303(i).

## III.    <u>Prime Capital Has Met Its Burden On Bad-Faith Damages</u>

The Petitioners contend that the bond cannot include an amount for damages under Section 303(i)(2) because Prime Capital has not presented evidence sufficient to establish a *prima facie* case of bad faith. (Opp'n at 16.) Prime Capital, however, has far exceeded a *prima facie* showing here. Indeed, this is a rare case where there are admissions from two of the petitioning creditors regarding the bad-faith basis for the petition.

The Petitioners also put forth two other arguments on the bad-faith issue, neither of which has any merit. *First*, the Petitioners claim that Prime Capital has not shown that it suffered any

16

damages. (Opp'n at 17.) The Petitioners admit that there were loans set to close that would have brought in LOC fees, and the Court is well aware from numerous hearings that borrowers were clamoring to get permission to do their deals. If not for the involuntary bankruptcy, Prime Capital could have sought funding for those deals from sources other than Berone. However, the involuntary bankruptcy caused all of Prime Capital's potential funding sources to dry up.

Other entities that are related to Prime Capital—including Prime Commercial Lending, LLC, Commercial Capital Training Group, and National Alliance of Commercial Loan Brokers LLC—have suffered from a major loss of business as a result of the Petition. While Prime Capital is not seeking damages with regard to those entities, their losses illustrate the deleterious effect of the wrongful involuntary bankruptcy commenced by the Petitioners.

*Second*, the Petitioners argue that Prime Capital must "provide distinct evidence of bad faith as to each Petitioning Creditor from whom it seeks a bond in excess of the amount of attorneys' fees" and that Prime Capital has not met that burden. (Opp'n at 18.) Prime Capital has provided sufficient evidence as to each of the Petitioners, but the actions of Compass and 526 Murfreesboro, by themselves, justify the imposition of a bond. In addition, the Petitioners have overlooked cases holding that the courts may hold petitioning creditors jointly and severally liable under Section 303(i). *See National Medical Imaging, LLC v. U.S. Bank, N.A.*, 263 F. Supp. 3d 542, 550 (E.D. Pa. 2017) ("Whether joint and several liability is available is within the discretion of the Court, and it is to be determined based on the totality of the circumstances."); *In re Rosenberg*, 471 B.R. 307, 317 (Bankr. S.D. Fla. 2012) ("[A] bankruptcy court nonetheless has discretion to hold all or some petitioners jointly or severally liable, to apportion liability or to deny an award against some or all petitioners depending on the totality of the circumstances."). For that same reason, the Court may impose the bond requirement on all of the Petitioning Creditors.

17

## <u>CONCLUSION</u>

For the foregoing reasons, Prime Capital respectfully requests that Court enter an order requiring the Petitioning Creditors to post a bond in the amount of $37 million within five business days of the entry of the Court's order.

Dated: March 4, 2024

Respectfully submitted,

HOGAN LOVELLS US LLP

By: */s/ Pieter Van Tol*

Pieter Van Tol (Bar Roll # 508405)
Christopher Bryant (admitted *pro hac vice*)
390 Madison Avenue
New York, NY  10017
Tel: (212) 918-3000
Fax: (212) 918-3100
pieter.vantol@hoganlovells.com
chris.bryant@hoganlovells.com

*Attorneys for Alleged Debtor*